**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------x

Marcus Robinson,

Plaintiff,

**COMPLAINT & JURY DEMAND**

vs.

Effy & Co., Inc. and EGHA Group Corp,
d/b/a Effy Jewelry and Effy,

Defendants.

-----------------------------------------------------x

## NATURE OF THE ACTION

Marcus Robinson, a Black man, was employed as a Guest Experience Specialist in Effy's Customer Service Department, but during the course of his employment was treated differently than white women. White women were held to a different standard of performance than employees of color, a dynamic which permeated the workplace daily, including related to productivity, timeliness, attendance, and presentability. Robinson was initially successful in referring several people of color from his network for employment at Effy, but once Customer Service became more racially mixed, Effy abruptly said that they would no longer hire any of his referrals.

Despite being aware that in mid-2025 a Black employee at Effy had resigned because the work environment was racially insensitive, nothing was done by Effy at that time to address the unequal work culture. So the work environment continued to be inhospitable. For example, Effy refused to celebrate Juneteenth as a paid holiday or honor it in the office though other holidays were recognized; the work culture was insensitive to Black people, such as when white employee Jane Doe described Robinson as a bouncer based upon her calcified stereotypes of Black men;

when Jane Doe asked Robinson to do circus tricks that were spotlighted for ridicule; and when Robinson was excluded from using a kosher kitchen that white employees regularly used.

The preferential treatment towards white women was routine, repeated, and continuous from the start of Robinson's employment through his final day and the frustration compounded to eventually reach a breaking point. In May 2026, Robinson spoke up, refusing to be unfairly saddled with the workload of a white woman who Effy did not hold to the same performance standards. In the ensuing discussion with the white woman, Robinson cursed at her for not carrying her fair share and for trying to shift her work onto him. Effy scolded, investigated, stereotyped and ultimately terminated Robinson for this single exchange though months earlier there were no repercussions when another white woman directed more vulgar profanity at a supervisor.

Robinson reported to Effy the disparate treatment and that he was being subjected to the "Angry Black Man" stereotype and he also spoke up about Effy's failure to pay overtime wages in violation of the labor laws. Robinson was fired within days. Doubling down on its racial stereotyping, Effy fired Robinson asserting that they were worried he would get angry at a customer or co-worker despite never previously having done so during his entire eighteen-month tenure at Effy. In comparison and demonstrating pretext, the white woman who used profanity towards a supervisor was not subjected to stereotyping, so was not seen as inherently intimidating and belligerent, and experienced no negative consequences for worse conduct.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 for civil actions arising under the laws of the United States and pursuant to 28 U.S.C. § 1367 for supplemental jurisdiction.

2. Plaintiff exhausted his administrative remedies by filing a charge with the United States Equal Employment Opportunity Commission ("EEOC"), was issued a Notice of Right to Sue, and timely filed this action.

3. In compliance with New York State and New York City law, Plaintiff will serve a copy of the Complaint on the New York City Commission on Human Rights; the New York City Law Department, Office of the Corporation Counsel; and the New York Attorney General, thereby satisfying the notice requirements of this action.

4. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claim occurred in the Southern District of New York.

**THE PARTIES**

5. Plaintiff Marcus Robinson ("Robinson" or "Plaintiff") is a Black man who lives and works in New York City.

6. Robinson was, at all times relevant, an "employee" within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C § 2000e et seq.; the Civil Rights Act of 1866, 42 U.S.C § 1981; the New York State Human Rights Law, NY Exec L § 296 et seq.; New York State Labor Law §215; New York State Whistleblower Law §740; and the New York City Human Rights Law, Administrative Code of the City of New York §8-107 et seq.

7. At all times relevant, Defendants Effy & Co., Inc. and EGHA Group Corp, d/b/a Effy Jewelry and Effy (collectively "Effy") have maintained offices at 390 Madison Ave., 21-22 Floor, New York, N.Y. 10017 and 7 West 45th St., New York, N.Y., 10036.

8. Defendants were, at all times relevant, Plaintiff's "joint employer" within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C § 2000e et seq.; the Civil Rights Act of 1866, 42 U.S.C § 1981; the New York State Human Rights Law, NY Exec L § 296 et seq.;

New York State Labor Law §215; New York State Whistleblower Law §740; and the New York City Human Rights Law, Administrative Code of the City of New York §8-107 et seq., with joint responsibility and oversight over the terms and conditions of employment, including the power to direct, discipline, hire and fire; centralized headquarters; shared human resources, legal department and payroll; and collectively had an employment relationship with the requisite number of employees to trigger coverage under each of the statutes.

## FACTUAL BACKGROUND

9. Effy is a jewelry designer, manufacturer and retailer with over 2,000 employees. Headquartered in New York City's Diamond District, it sells its products online and in department stores, cruise ships and land stores in the Caribbean. In addition, Effy has branched out to become a travel media and destination marketing company that produces cruise magazines, onboard television programming, port shopping guides, and shopping events featuring Effy jewelry for cruise passengers along with everyday essentials, souvenirs and gifts for purchase on cruise ships.

10. Marcus Robinson is a dedicated customer service professional with extensive experience since 2009 delivering exceptional support in luxury retail and high-volume service environments. Robinson holds a bachelor's degree, which assists him in resolving complex customer issues, managing multiple priorities, and building lasting client relationships through personalized service and effective communication. He is experienced in handling shipping logistics, order management, service recovery, VIP client support, and cross-functional coordination while consistently maintaining high standards of professionalism and creating positive customer experiences that result in client satisfaction, loyalty, and business success. Robinson has worked with luxury clients at Louis Vuitton, Saks Fifth Avenue, Bebe, and

Bloomingdales, to name a few retail establishments, and as a Personal Assistant to Kim Burse, a Creative/Music Director for various celebrity performers.

11. Robinson was hired by Effy in November 2024 as a Guest Experience Specialist in its Customer Service Department ("Department" or "Customer Service"), which handles all of the product lines carried by Defendants and their associated companies.

12. Robinson's supervisors were Andrea Minichini ("Minichini"), Head of the Customer Service Department, and Rafi Setareh ("Setareh"), Senior Managing Director (collectively, "management").

**Robinson's Talent Shines Through**

13. During his employment at Effy, Robinson distinguished himself as an efficient and reliable employee who went over and above to ensure that clients were treated with professionalism and care. Throughout his employment, Robinson maintained a strong work ethic and consistently received positive feedback regarding his performance and commitment to tireless customer service.

14. After his first year of employment, Robinson was given a raise based upon his performance. Whenever someone was out of the office, Robinson repeatedly stepped up to cover their workload and handled additional customer service tickets. For example, he went above and beyond by assisting Noah Elmore, Senior Manager, by completing appraisals early for a customer account valued at over one million-dollar dollars. Robinson contributed to streamlining overall systems and improved workflow for Customer Services by implementing a call rotating system.

15. While Effy was not an ideal workplace, Robinson believed that they compensated well for a retail job. Over time, he referred five women of color, from his personal and professional network, who were hired by Effy.

16. As these women of color were hired, the composition of the Customer Service Department began to shift to a more racially mixed staff, while management continued to be all white.

17. Effy was willing to hire a limited number of employees of color in the Customer Service Department but imposed different terms and conditions upon employees based upon race.

**White Women are Given Preferential Treatment by Effy**

18. The changing demographics within the Customer Service Department threw into sharp relief how Effy subjected people of color to different performance standards. It became increasingly apparent to Robinson that white women in the Customer Service Department received more favorable treatment than people of color.

19. White women frequently slacked off with no repercussions. Almost every day, white employees Martha and Charlotte[1] could be found periodically watching TikTok reels and doing crossword puzzles. White employee Jane Doe ("Doe") was often scrolling on her phone for long periods during the workday. White women would take long breaks throughout the day, push off their customer request tickets, and delay issuing store credits for days.

20. When white employees were late or less productive, others including Robinson were forced to shoulder additional work and carry the Department. Robinson had to compensate for white women by handling additional customer requests in coverage areas that did not belong to him or pacifying angry customers calling in with follow-up inquiries.

21. Licensing substandard conduct by white employees impacted the morale of employees of color in Customer Services because it was apparent to all that Effy coddled white employees and held people of color to different expectations.

[1] Surnames or entire names of some third parties have been omitted here but is known by Effy.

22. For example, when the customer request tickets were left unanswered by Doe, management would say affectionately to her, “How are you feeling today?” or “Oh baby, do you need help?” And management would often then redirect her work to others in the Department by saying, “Help Doe with her tickets.” Others often took on Doe’s work when she was literally sitting right next to them in the office. When confronted about Doe’s shortcomings, management would make excuses for her dereliction.

23. Employees of color were not treated with kid gloves. Instead, if their work ever faltered, management would ask people of color with irritation, “What’s going on??” or say, “You can do better!”

24. When Black employee Keith was not performing up to par, management would get noticeably frustrated and call him into the office to address his shortcomings. Management eagerly heaped on criticisms of Keith, bemoaning and broadcasting his deficiencies to others.

**White Women Come and Go as they Please, but Employees of Color are Surveilled**

25. White women were often late or absent and Effy administered little to no consequences.

26. For example, white employee Anna was regularly 30-60 minutes late. Martha was often 30 minutes late. Doe was often 15-30 minutes late. Management did not chastise them for their lateness, it was simply understood in the office that these white women would often be late.

27. In contrast, if employees of color were frequently late, they were observed, surveilled and spotlighted.

28. For example, Jojo, a Black Dominican employee, would be singled out when she was late. Management would say snidely, to convey disapproval to Jojo when she was late, “Ohhhhh, Jojo has to have her coffee before she can start working.” When Jojo was late, white

employee Sarah would follow Jojo to the bathroom to make sure she was actually using the bathroom. On information and belief, Sarah collaborated with management in undertaking this practice.

29. When Black employee Keith called out from work for medical reasons, management would openly complain and his social media was checked to see if he was lying.

30. Every day white employees Charlotte and Martha were joined at the hip and would go everywhere together at work, including to the bathroom, to the kitchen, or elsewhere, and never got in trouble for that. If Martha was assigned to cover the phones at the front desk, Charlotte would leave her desk and keep her company. Management said nothing when they left the office, even though others had to answer all the incoming customer phone calls in addition to their regular work responsibilities.

31. In contrast, employees of color were scolded if they did the same. In one such instance, in fall 2025, employee of color Natalie's mom came to have lunch with her. Since her mom was waiting outside on the street, employees of color Lyna, Shelly and Robinson went outside to briefly meet Natalie's mother.

32. Not even ten minutes later, when the employees of color returned to the office, management was upset with the employees of color who had gone outside. Management reprimanded them, claiming that no one was in the office to answer the phones, although white employees Doe, Charlotte, and Anna had remained in the office.

33. In another example, management would get visibly annoyed when Black employee Keith would leave the office just before 5:00 PM.

**White Women are not Expected to Dress Professionally for Work**

34. Effy's office is located in the diamond district in a large office building housing many professionals.

35. Effy markets itself as a purveyor of distinctive and elegant jewelry. In keeping with this brand image and the nature of the work, employees of color in the Customer Service Department came to work dressed sharply in stylish, professional attire.

36. Many of the employees of color came from a fashion retail background and dressing appropriately is part of their work ethic. They made an effort to dress nicely for work, including by wearing pantyhose, high heels, makeup, designer bags and shoes, and jewelry.

37. White employees in Customer Services were not expected to come to work looking neat, well-groomed and with well-fitting clothes. To employees of color, it was upsetting and undermining that Effy tolerated when a wealthy, white woman like Doe rolled into work late, unkempt, and dressed in what looked like pajamas.

38. Doe was permitted to wear anything to work whereas employees of color like Iliana were held to higher standards and reprimanded for attire that Effy did not approve of.

**Effy is on Notice of the Hostile Work Environment but Does Nothing**

39. As the racially disparate treatment intensified at Effy, one woman of color resigned in mid-2025. She notified Effy that she was resigning because the work environment was racially insensitive and leaving the job because of the favoritism towards white employees. In particular, she objected to the fact that a white employee was granted a transfer to another department at Effy whereas she was told no transfer would be permitted. In addition, she observed that Effy was forgiving when white employees were late, but not when employees of color were.

40. Everyone in the Customer Services Department learned of the employee's resignation and that she was leaving because of racial discrimination at Effy. Despite the resignation caused by and describing a racially hostile work environment, Effy did not respond with an investigation, an announcement to staff, or by providing any training or education in discrimination or harassment.

41. Effy did not try to stop the employee from resigning or promise to promote a better and more equitable work environment. Nor did Effy assure its existing employees of color that they would be treated fairly.

42. In fact, Effy did not provide discrimination or harassment training until 2026.

43. Despite the resignation caused by a racially hostile work environment, Robinson was not made aware of any discrimination and retaliation policy and complaint procedure at that time.

44. Further, Effy did not even employ a designated and trained Human Resources professional prior to 2024.

45. Effy's failure to provide policies and protection against discrimination and failure to act on this complaint of discrimination signaled to other employees of color that reporting discrimination would be futile and that Effy did not care about its employees of color.

46. Robinson was saddened by the culture of differential treatment that he observed first-hand and distressed to witness a Black woman resign in protest of the hostile work environment that he continued to work in.

**Effy Fails to Provide a Harassment-Free Workplace**

47. The preferential treatment towards white employees was routine, repeated, and continued from the start of Robinson's employment through his final day.

48. As a result of Effy's failure to provide a harassment free work environment, white staff sometimes mistreated people of color.

49. In one example, one day in the fall of 2025, Robinson came into work proudly wearing a fashionable suit with the intention of looking elegant and stylish for work.

50. Upon encountering him, Doe could have complimented Robinson's smart attire and recognized him as any conceivable kind of professional that might wear a suit, including an executive, a lawyer, a politician or a corporate professional.

51. But Doe's narrow worldview only housed stereotypes of Black men.

52. Doe said to Robinson in front of several co-workers, snickering, "Oh my god, you look like a bouncer," presumably like the security she had encountered at the nightclubs she frequented on the Lower East Side. Others laughed at Doe's comment.

53. In Doe's imagination, a Black man in a suit could only be engaged in blue collar, physical, or security work as opposed to white collar work requiring an academic degree. In professional or "upscale" environments, Black men are frequently mistaken for the service class, including help, staff, or valet, rather than the clients or owners.

54. In addition, Black men are stereotyped as suitable for bouncer or security roles because they are seen as inherently intimidating and capable of violence, as embodied by the Angry Black Man stereotype. This stereotype bloats and caricatures normal behavior as aggressive or threatening when it is effectuated by a Black man.

55. Robinson was insulted and deflated to be reduced to a stereotype by Doe. He was reminded by her comment that regardless of his college degree and the luxury environments in which he has worked, he was always at risk of being viewed as an Angry Black Man. When Doe

called him a bouncer that day, Robinson did not foresee that the Angry Black Man trope would be later wielded by Doe to have him fired.

**Robinson is Mocked**

56. In another instance, while at the 2024 Effy holiday party, Doe implored Robinson to do a gymnastic split on the dance floor in a room full of white people.

57. Robinson had been hired just weeks earlier and was eager to succeed at Effy and among his peers. Though he was reluctant, he relented. With her camera in hand, Doe laughed, covering her mouth and pointing at him, cajoling others to ogle Robinson as she delighted in the spectacle.

58. The next day Doe gleefully shared with people in the office the image of Robinson doing a split on the dance floor. Robinson overheard Martha and Charlotte laughing at the image shared by Doe. Robinson confronted Doe and told her he did not appreciate that she was sharing the image of him.

59. Afterwards, without Robinson's consent, Effy IT pulled the CCTV footage of Robinson, a heavy-set Black man, doing a split at the holiday party, and circulated the entire video widely in the office. Robinson felt ridiculed him like some kind of circus anomaly.

60. The Effy Online Department asked Robinson if they could post an image of him doing the split on its "Wall of Shame" which was a wall where they hung images that they found humorous and embarrassing. He refused but was insulted by the request.

61. During the holiday party the following year, Rama Nabavian ("Nabavian"), Senior Vice President of Global Operations and Integrations, told Robinson that he saw the video of him doing a split from the previous year's holiday party. He said to Robinson, "I can't believe IT pulled that video. I almost blew a gasket when I saw it."

62. Nabavian then begged Robinson to do another split, but he politely declined. But this time the request came from a very senior leader at Effy, who insisted, assuring Robinson, "it's just for me, for my personal album. It won't get out."

63. Pressured, Robinson again relented but moved over to the corner of the room, away from everyone, while Nabavian took a photo of Robinson doing a split at the 2025 Effy holiday party.

64. Robinson felt humiliated because he wanted to be valued for his professional contributions, not for performing some kind of minstrel show[2] for white people at Effy.

**Effy Refuses to Honor Juneteenth**

65. Effy provides employees with paid holidays for approximately 13 days a year. Some are federally-recognized holidays and the rest are religious or cultural events, including 6 for Passover, Shavout, and Yom Kippur; 1 for Christmas; and 2 for Thanksgiving.

66. In June 2025, Robinson inquired about whether Effy was planning to offer a paid holiday for Juneteenth.

67. Juneteenth[3] is federal holiday commemorating the date when enslaved Black people were declared free under the terms of the 1862 Emancipation Proclamation.

68. Robinson was told by Human Resources that Effy would not offer Juneteenth as a paid holiday but those who could work from home were permitted. Human Resources knew full well that in June 2025 the Customer Services Department was not set up to permit remote work, so no one could work from home on Juneteenth.

69. There was no acknowledgement of Juneteenth at Effy during any year while Robinson worked there. Effy celebrated other holidays in the office including the Jewish holiday,

[2] https://en.wikipedia.org/wiki/Minstrel_show
[3] https://www.britannica.com/topic/Juneteenth

Purim. On Purim, Effy gave out hamantaschen, handed out a card explaining what Purim is, and the lunchroom and waiting room was occupied by prayer for many hours.

**Effy Reaches its Racial "Tipping Point"[4] for Staff of Color**

70. When Robinson started at Effy, there had been a few token employees of color in his Department. Now with more than double, Effy felt threatened about the changing demographics.

71. In a phenomenon akin to residential white flight,[5] Effy concluded that the office was now staffed with "enough" employees of color. They decided to stop or slow their hiring of people of color.

72. Starting in 2026, Robinson observed that qualified people of color that he had referred to Effy were no longer getting interviews. Robinson provided their resumes to Effy Human Resources, but despite their qualifications, they were not getting hired. However, white people were getting called back for the same jobs.

73. In March 2026, Robinson observed that resumes sent by people of color had less traction than resumes of white employees sent to Effy.

74. Suspecting that discrimination was afoot, Robinson confronted Minichini about why his referrals were not getting jobs at Effy.

75. Minichini responded to Robinson that Effy leadership said that they did not want to hire any more of his referrals.

76. Despite Effy's preferential treatment towards white people, Robinson persisted in referring qualified people of color to Effy because the pay was good.

[4] https://en.wikipedia.org/wiki/Tipping_point_(sociology)
[5] https://en.wikipedia.org/wiki/White_flight

77. In April 2026, Robinson referred multiple candidates of color for job vacancies in positions for Customer Service and Operations, but they were not hired; instead, two white people were selected for those roles.

78. Robinson felt demoralized by the discrimination he was observing in his work environment.

**Robinson Reports Labor Law Violations by Effy**

79. In early April 2026, Effy notified staff in the Customer Service Department that they were now reclassified from salaried to hourly pay. After reviewing his work history, Robinson realized that he had worked substantial overtime hours, including on weekends, evenings, and during meal breaks.

80. Robinson concluded that he was not paid overtime compensation. He had worked approximately 42 hours in each workweek from August 2025 to April 2026 but had not received 1.5 times his hourly rate for those additional 74 hours.

81. In early April 2026, Robinson reported these violations of the federal and state labor laws to Karolina Bortko ("Bortko"), Senior Director of Human Resources and Joshua Hackman ("Hackman"), Effy General Counsel, and shared his belief that he was entitled to overtime pay.

82. After speaking with both, Robinson began to put together email timestamps, work communications, calendar activity, and related records to prove his overtime hours, but Bortko said there was no need for the documents. She said that she would look into his inquiry.

83. However, Robinson did not hear back from Bortko or Hackman again about his overtime hours.

**Effy Dissuades Black Employees from using its Kosher Kitchen**

84. Since Robinson began working at Effy in November 2024, white employees in the Customer Service Department had used the Effy kosher kitchen located nearest to their office. In

particular, several white employees frequently used the egg machine to boil eggs. They raved about how quick, healthy and delicious the eggs came out of the egg maker.

85. One day, on or about April 20, 2026, Robinson decided that he would try the egg machine himself. On his way back from the kitchen, he encountered the assistant for Sean Hakimi ("Hakimi"), Senior Vice President of Corporate Operations, who noted Robinson's cooked eggs.

86. The same day that Robinson used the egg machine for the first time, Hakimi sent an email to staff directing them to only use the kosher kitchen for kosher food.

87. Robinson grew up in a religious household and was taught to be respectful of all religions. He was hurt by the insinuation that he had not honored religious practices when in fact he had intentionally purchased kosher eggs for use in the Effy kosher kitchen.

88. Robinson also felt singled out based on his race since white people had been using the kitchen without incident so long as he was at Effy. Robinson went straight to Hakimi himself. He objected to the email and to being dissuaded from using the egg machine.

89. Hakimi responded that the egg machine was only for kosher food.

90. Robinson explained that he had in fact used kosher eggs, but Hakimi expressed skepticism.

91. Robinson pulled up his Costco purchase history for the eggs, which indicated that they were indeed kosher and he showed Hakimi the receipt on the spot.

92. After that conversation, instead of permitting Robinson to now use the egg machine in the kosher kitchen near Customer Service, it was removed altogether.

93. Effy regularly permitted white women to use the kosher kitchen for making eggs but the one time when a Black man used the egg machine to prepare kosher eggs, Effy removed it from the kosher kitchen.

**<u>Effy's Unequal Treatment of Black Men Pushes Robinson to the Limit</u>**

94. By May 2026, Robinson had become increasingly frustrated with management's preference and leniency towards white women like Doe, Anna, Martha, and Charlotte while he observed people of color laboring fastidiously to meet the demands of the workload and suffering consequences if they did not.

95. Jane Doe was treated by Effy like a pampered, delicate prima donna, who they called "baby" and "sweetie." She was routinely permitted without consequence to arrive to work late, wear clothes that looked like pajamas to work as if she just rolled out of bed, spend a significant amount of time scrolling on her phone, delegate her responsibilities to others, and generally avoid carrying a fair share of the workload.

96. Doe was not held accountable by Effy for her shortcomings. Instead, when she wasn't doing her job, managers asked her gingerly, "are you feeling okay today?" Despite complaints from the staff about her, there were no repercussions when Doe sloughed off her work and others had to compensate for her.

97. Day after day, the disparity intensified. Doe would frequently reassign to other employees customer request tickets that had been assigned to her or that she had already begun.

98. When confronted, Doe would regularly behave as if she'd been victimized and would typically cry crocodile tears to garner sympathy. Management coddled this conduct.

99. Other white employees, like Martha and Charlotte, also got away with slacking off and not doing their work. They dragged out issuing simple store credits for weeks, leading to many customer calls and complaints for the rest of the Department. They played crossword puzzles on their work computer together during high peak work hours while staff of color were busy working while being closely watched for productivity.

100. Effy tracked how many customer calls each employee picked up and Minichini would announce those metrics to the staff. Doe was always at or near the bottom of the list for answered calls, but there were never any consequences for her.

101. Meanwhile, as staff of color were compensating for the shortcomings of many of their white peers, they were also held to higher standards than white employees and reprimanded if they tried to get away with the same, including by being told, “You can do better!” Black employee Keith was frequently the subject of criticism by management about his competence and credibility.

102. On May 7, 2026, not long before the workday was over, Doe began reassigning her client ticket to Robinson, though she was already working on a pre-existing ticket with that client. Doe frequently redistributed her workload to others with no justification.

103. Robinson tried to assign the ticket back to her. Doe sent it back to him again. This back and forth went on for several cycles with no explanation from Doe about why she was sending her customer request ticket to him.

104. Pushed to his limit by Effy’s preferential treatment towards white women, Robinson called out to Doe from the opposite side of the large office and asked her rhetorically why she kept assigning her tickets to him.

105. He told Doe that she was being a “lazy bitch” and was “not helping with the workload.” He added that she spent a “significant amount of time on her phone” and that she was not “contributing fairly to the team’s responsibilities.”

106. Such conversational profanity was used by just about everyone in the Customer Service Department, including Robinson’s supervisor and by Human Resources. In fact, staff and managers frequently referred to nasty customers or colleagues of all genders as “bitches.”

107. Martha, a white employee, interjected forcefully and asked Robinson, "Are you talking to [Doe] like that?"

108. Several months earlier Martha had used profanity to address her manager, Rafi Setareh ("Setareh"), and was now audaciously critiquing Robinson.

109. Robinson responded to Martha, matching her tone and energy, and replied, "Yes I'm talking to [Doe] like that, just the same way you cursed out [Setareh]." On the spot, Robinson called out Martha for her hypocrisy, reminding her that anyone can have a "weak moment," just like when Martha herself lost her temper with Setareh.

**Robinson is Chastised while Doe is Comforted**

110. In response, Doe began her manipulative crying, as she typically did whenever given inconvenient feedback or instructions. Setareh, who was the manager on duty, went to Doe's desk to comfort her.

111. In contrast, Setareh then brusquely summoned Robinson to the manager's office.

112. Setareh did not summon or reprimand Doe, a white woman, for instigating the interaction by sending and resending Robinson her customer ticket, for not working and/or passing her work on to others, or for any of the performance failures that impacted Robinson.

113. Setareh did not summon or reprimand Martha, a white woman, for interjecting, escalating and holding Robinson to a different standard than herself.

114. During the meeting with Robinson, Setareh said Robinson should apologize to Doe. Robinson declined in that moment because emotions were still high but said he might do so the next day. Robinson immediately assured Setareh that speaking loudly and cursing would not happen again.

115. Robinson also noted the disparate treatment, reminding Setareh about how Martha had cursed at Setareh in the office not long ago but there was not a similar reaction by management.

**Robinson Apologizes to Doe**

116. Robinson left the office shortly afterwards and was flooded with remorse for losing his temper at work.

117. On the bus ride home, he told co-worker Natalie Phillips that he was going to apologize to Doe the next day.

118. Robinson also immediately called his manager, Minichini, told her what happened, and that he would apologize to Doe the next day; she directed him to send a statement directly to her and Setareh, which he did on the same day.

119. Though the next day, May 8, 2026, was his work-from-home day, Robinson came into the office specifically to apologize to Doe. Since she was not in the office, he reached out to her to apologize.

**Effy Characterizes Robinson as an "Angry Black Man"**

120. Upon encountering Setareh that morning, Robinson told him he was ready to apologize to Doe. Robinson also said to Setareh: "You didn't even ask me how I'm doing today or if I'm okay. I didn't eat last night. I came in just to apologize to [Doe] on my work-from-home day."

121. Defaulting to the Angry Black Man stereotype, Setareh implied that Robinson was not himself susceptible to being wounded or upset about the interaction with Doe. Setareh responded disdainfully, "if *you're* okay?" Robinson responded, "I have feelings too."

122. Setareh doubled down on the stereotype by telling Robinson that "Nobody wants to work with a 'ticking time bomb;' people want to come to work and feel safe."

123. Robinson objected to the racial characterization and racial stereotype that a Black man using a curse word creates an unsafe work environment; rejecting the double standard,

Robinson emphasized the differential treatment by pointing out, "When Martha curses, people feel safe, but when I curse, I'm a ticking time bomb?"

124. No investigation was undertaken by Effy in response to Robinson's complaint of discrimination.

**Co-workers Declare Frustration with Effy's Failure to Police Doe's Laziness**

125. That same day, May 8, three female co-workers, Lyna, Shelly, and Anna, submitted statements to Effy echoing their shared, collective frustration with Doe and contextualizing and justifying Robinson's reaction to Doe's laziness and impunity.

126. The co-workers described in their signed statements how the situation in Customer Service had reached a "boiling point" since Doe was constantly reassigning her work, disengaged at work, on her phone and with headphones in, "weaponiz[ing] incompetence," "strategically and purposely neglect[ing] to do the simplest tasks," and not "attempt[ing] to pull her weight."

127. The co-worker statements detailed inequitable work distribution and decreased overall productivity caused by Doe's failures.

128. The co-worker statements described frustration, a decline in morale, resentment, and disheartenment as a result of Doe's conduct and Effy's permissiveness towards her.

129. The co-worker statements memorialized that the concerns about Doe had been raised to Effy before and nothing had been done.

130. The next business day, May 11, Robinson apologized to Martha, despite that she had needlessly inserted herself in the exchange with Doe in spite of having done worse herself.

**After Robinson Complains, Effy Initiates an Investigation of Robinson**

131. Having not heard back from Effy about his overtime pay, on May 13, 2026, Robinson reported again to Bortko that he was entitled to and not paid for 74 overtime hours; he

described how, in violation of the labor laws, he had not been paid for 42-hour workweeks from August 2025 through April 2026.

132. Later that day, Robinson went to speak to Joshua Hackman, General Counsel for Effy, in his office, about the failure to pay overtime.

133. That same day, six days after the incident with Doe, Bortko suddenly commenced a formal investigation of Robinson's conduct.

**Effy's Profanity Rules only Apply to Black Men**

134. Starting on May 14, 2026, Bortko interviewed several employees including Robinson. During the interview with Bortko, Robinson started crying, said he hadn't eaten any dinner the night that he cursed at Doe, expressed genuine remorse, and explained that he had regretted his conduct immediately after the incident. He described his efforts to apologize both in person and in writing to Doe. He described how he came into the office in-person, on his work-from-home day, to apologize and had separately reached out to her.

135. On information and belief, Doe was not interviewed as a part of the investigation despite that she instigated the interaction on May 7, and in the many months preceding that day, as evidenced in part by Robinson and the statements from other co-workers vigorously complaining about her work ethic and contributions.

**Robinson Reports Unequal Treatment and Discriminatory Stereotyping**

136. During the interview with Bortko on May 14, Robinson also raised concerns about racially unequal treatment by Effy. Robinson reported to Bortko that he believed he was being treated differently based upon his race.

137. First, he reported the contrast between how his situation was being escalated to Human Resources while Martha, a white woman similarly situated in the same department and

under the same supervisors, faced no discipline for more extreme conduct including insubordination against a supervisor instead of a co-worker.

138. Co-workers who were interviewed by Bortko told her that they had heard worse profanity in the office and that nothing had been done by management in the past.

139. Months before the incident with Doe, there was an incident between Martha and her supervisor, Setareh, during which she said to him, “You’re a fucking asshole.” Martha’s conduct was not escalated to Human Resources for investigation.

140. Though her language was more vulgar than Robinson’s, and her comments were directed towards a supervisor, Martha was not punished or terminated for using profanity. On information and belief, Martha did not have to prepare a statement, was not interviewed by Human Resources, and nothing was placed in her personnel file reflecting that she cursed at her supervisor.

141. Next, Robinson specifically expressed concern that management viewed him through the lens of the “Angry Black Man” stereotype, criminalizing and fearing him despite having no history of workplace violence, threats, or disciplinary issues. He reported that the one-off cursing incident was suddenly such a big deal when “the big Black man in the office” did the very same thing as multiple other white women.

142. He also reported to Bortko that Setareh viewed and described him as an Angry Black Man by baselessly calling him a “ticking time bomb” and by saying that Robinson was threatening staff’s need “to come to work and feel safe.” These were unjustified characterizations premised upon stereotyping because his employment record betrayed such a conclusion.

143. On information and belief, no investigation was conducted into Robinson’s discrimination complaints.

**Robinson is Terminated after Reporting Discrimination and Labor Law Violations**

144. On May 15, 2026, days after reporting discrimination and labor law violations to Effy, Robinson was terminated.

145. Despite that Robinson had complained about being called a "ticking time bomb," the accusation that people did not feel safe around him, and that he was being treated like an "Angry Black Man," Bortko leaned into and leveraged the very same stereotype to terminate Robinson.

146. Bortko told Robinson that he was being terminated because Effy was worried that in the future, he might become angry and use profanity toward a guest or another coworker. In the previous eighteen months of service Robinson had never engaged in such conduct. In contrast, Effy harbored no such fears about multiple white women who engaged in similar or more serious conduct.

147. Effy's reason for termination was discriminatory on its face as well as a pretextual since others outside Robinson's protected class experienced no consequences for similar or worse conduct. In fact, Bortko herself had engaged in profanity in the office. During the investigation, she said during an interview while laughing that she curses in the office too. Bortko, a white woman and the Senior Director of Human Resources, suffered no discipline or consequences for her use of profanity. There were no concerns by Effy that she might become angry and use profanity with a guest or employee.

148. Other Effy employees that are white were guilty of more severe violations than calling a co-worker by a curse word. Reportedly, an employee continued to be employed after misusing the Effy corporate card for soliciting prostitutes and after masturbating in a sauna on a cruise ship where he worked for Effy.

**Robinson and the White Women at Effy Live in Two Different Worlds**

149. Doe left Effy on her own volition after the co-worker statements critiquing her were shared with management; she moved on contentedly with her privileged life and was none the worse for resigning from Effy on her own terms.

150. She documented on social media how she was globetrotting in Europe and the Middle East, smiling courtside at a New York Knicks game, and fishing on Fire Island.

151. Other white women who used profanity also suffered no consequences, including Martha -- who had cursed out her supervisor – and who continues to work at Effy today.

152. In contrast, after he was terminated, Robinson felt numb and defeated. He struggled to find a new job, had to fight for unemployment insurance coverage by Effy, and could not cover his bills. Robinson was depressed and sickened by the scourge of racism in both the world and in his own work life at Effy as a victim of discrimination towards Black men.

**CLAIMS**

FIRST CAUSE OF ACTION

**Discrimination Based upon Race and Sex in Violation of the New York State Human Rights Law, NY Exec Law § 296 et seq. and the New York City Human Rights Law, Administrative Code of the City of New York §8-107 et seq.**

153. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

154. Plaintiff was subjected to a hostile work environment and was discriminated against in the terms and conditions of employment because of his race and sex.

155. As a direct and proximate result of Defendants' discrimination, he has suffered and continues to suffer damages including mental anguish and emotional distress.

## SECOND CAUSE OF ACTION

**Discrimination Based upon Race and Sex in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C § 2000e et seq. and Discrimination Based upon Race in Violation of the Civil Rights Act of 1866, 42 U.S.C § 1981**

156. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

157. Plaintiff was subjected to a hostile work environment and was discriminated against in the terms and conditions of employment because of his race and sex.

158. As a direct and proximate result of Defendants' discrimination, he has suffered and continues to suffer damages including mental anguish and emotional distress.

## THIRD CAUSE OF ACTION

**Retaliation in Violation of the New York State Human Rights Law, NY Exec Law § 296 et seq. and the New York City Human Rights Law, Administrative Code of the City of New York §8-107 et seq.**

159. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

160. Plaintiff reported discrimination in the workplace and opposed discrimination in the workplace and as a result suffered actions that were reasonably likely to deter a person from engaging in protected activity.

161. As a direct and proximate result of Defendants' retaliation, he has suffered and continues to suffer mental anguish and emotional distress.

## FOURTH CAUSE OF ACTION

**Retaliation in Violation of Title VII, the Civil Rights Act of 1964, 42 U.S.C § 2000e et seq. and the Civil Rights Act of 1866, 42 U.S.C § 1981**

162. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

163. Plaintiff reported discrimination in the workplace and opposed discrimination in the workplace and as a result suffered adverse actions.

164. As a direct and proximate result of Defendants' retaliation, he has suffered and continues to suffer mental anguish and emotional distress.

FIFTH CAUSE OF ACTION

**Retaliation in Violation of N.Y. Labor Law §215**

165. Plaintiff realleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

166. Plaintiff engaged in protected activity by reporting violations of federal and state labor laws in underpayment of overtime and suffered adverse actions.

167. As a direct and proximate result of Defendants' retaliation, he has suffered and continues to suffer mental anguish and emotional distress.

168. The retaliation is bad faith, malicious, willful and wanton.

SIXTH CAUSE OF ACTION

**Retaliation in Violation of the N.Y.S. Whistleblower Law, N.Y. Labor Law §740**

169. Plaintiff realleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

170. Plaintiff engaged in protected activity by objecting to and reporting to a supervisor an activity, policy, or practice he reasonably believed to be a violation of federal and state labor and anti-discrimination laws and he suffered adverse actions.

171. As a direct and proximate result of Defendants' retaliation, he has suffered and continues to suffer mental anguish and emotional distress.

172. The retaliation is bad faith, malicious, willful and wanton.

## PRAYER FOR RELIEF

While reserving the right to seek additional damages and plead additional causes of action as available, Plaintiff demands judgment against Defendants as follows:

A. Injunctive relief and a declaratory judgment in favor of Plaintiff against Defendants, declaring that Defendants have violated the law by discriminating against and retaliating against Plaintiff;

B. On all applicable causes of action, back pay and benefits and front pay and benefits, plus compensatory damages;

C. Reinstatement of Plaintiff to the same positions held before the retaliatory action, or to an equivalent position, or front pay in lieu thereof;

D. The reinstatement of full fringe benefits;

E. On all applicable causes of action, an award of liquidated and punitive damages in an amount to be determined at trial;

F. All costs and disbursements of this action, including reasonable attorneys' fees; and

G. Any other further relief the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands trial by jury of all issues as of right by a jury.

Dated: October 31, 2026

LAW OFFICE OF RITA SETHI

By:
Rita Sethi, Esq.

7 Shorewood Drive
Sands Point, NY
11050
(516) 776-8209
*Attorney for Plaintiff*